SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. MARKEESE MITCHELL (and two companion cases[1])

 
 Docket:
 SJC-13528 / SJC-13529 / SJC-13530
 
 
 Dates:
 November 4, 2024 – May 20, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Dewar, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Homicide. Evidence, Bias, Disclosure of evidence. Practice, Criminal, Jury and jurors, Voir dire, Challenge to jurors, Investigation of jurors, Conduct of juror, Disqualification of judge, New trial. Jury and Jurors. Constitutional Law, Jury, Impartial tribunal.
 
 

             Indictments found and returned in the Superior Court Department on April 18, 2008.
            Motions for a new trial, filed on June 11 and July 5, 2018, were heard by Judith Fabricant, J., and a motion for disqualification, filed on June 18, 2020, was considered by her.
            After review by the Appeals Court, 102 Mass. App. Ct. 831 (2023), the Supreme Judicial Court granted leave to obtain further appellate review.
            Cathryn A. Neaves for Markeese Mitchell.
            Brooke Hartley, Assistant District Attorney, for the Commonwealth.
            Richard B. Klibaner, for Pedro Ortiz, was present but did not argue.
            Richard L. Goldman, for Terrance Pabon, was present but did not argue.
            Ruth Greenberg, for Brian G. Brito, amicus curiae, submitted a brief.
            GEORGES, J.  In a joint trial, Markeese Mitchell, Pedro Ortiz, and Terrance Pabon (defendants), along with codefendant Paul Goode,[2] were convicted of murder in the second degree.  More than two years later, the defendants jointly moved, pursuant to Commonwealth v. Fidler, 377 Mass. 192 (1979), to interview a juror regarding alleged bias and concealment of material information during jury selection.  The motion was denied.  The convictions and the denial of the Fidler motion were affirmed on appeal.  See Commonwealth v. Mitchell, 89 Mass. App. Ct. 13, cert. denied, 580 U.S. 899 (2016) (Mitchell I).
            Years later, the defendants filed motions for a new trial, citing additional evidence of the same juror's alleged bias.  This time, the motion judge -- who had presided over the trial and denied the initial Fidler motion -- conducted an evidentiary hearing at which the juror testified.  Following the hearing, the judge denied the defendants' new trial motions.
            Subsequently, the defendants jointly moved to disqualify the trial judge and for a new Fidler hearing before a different judge.  The same motion judge denied this motion.  After the Appeals Court affirmed the orders denying the motions for a new trial and for disqualification, see Commonwealth v. Mitchell, 102 Mass. App. Ct. 831, 848-849 (2023) (Mitchell II), we granted further appellate review.
            The defendants raise two principal arguments.  First, they contend that they are entitled to a new trial because the juror failed to provide an honest response to a material question during empanelment, and an honest response would have provided valid grounds for a challenge for cause.  Second, they argue that the trial judge should have been disqualified due to a conflict of interest, as the prosecutor from their original trial had since been appointed as a Superior Court judge under the oversight of the trial judge.
            For the reasons discussed below, we conclude that the trial judge did not abuse her discretion in denying the motions for a new trial or the motion for disqualification, and affirm both orders.[3]
            Background.  We summarize the relevant facts found by the judge, supplemented by uncontested facts from the record that align with the judge's findings, reserving further details for discussion below.  "We [also] summarize the trial evidence only to the extent relevant to the postverdict inquiry."  Commonwealth v. Kincaid, 444 Mass. 381, 382 (2005).[4]
            1.  Underlying crime.  The victim, a sixteen year old boy, assaulted Jaleek Leary, a fourteen year old resident of Wilcock Street in Dorchester.  In response, arrangements were made to lure the victim to Wilcock Street.  A fight erupted, during which the defendants -- friends and relatives of Leary -- chased the victim to a nearby street and fatally stabbed him.  The defendants, along with Goode, were charged with murder in the first degree and jointly tried beginning in April 2010.
            2.  Jury empanelment.  Jury selection for the trial spanned five days in April 2010.  Before entering the court room or learning details of the case, potential jurors completed questionnaires.  Juror no. 15 -- the juror in question –- indicated on her form that she lived in Dorchester, within the same ZIP code as the crime scene.  Additionally, in response to whether she "or anyone in [her] household or family" had any prior interactions[5] with "the law," she marked "no."  The trial judge emphasized the importance of accurate responses to this question, explaining:  
"It is very important that we have a complete and accurate answer to this question, even if you think it's really irrelevant.  Indeed, it may be irrelevant, but we need to know the information so that we can make a judgment about whether it has any relevance."
            On the final day of jury selection, after having addressed the jury pool, the trial judge individually questioned juror no. 15.  The juror, who had not responded affirmatively to any general questions, assured the judge that she could be fair and impartial.[6]  When asked if there was anything she wished to disclose, juror no. 15 answered, "No."  Although juror no. 15 lived in Dorchester, she stated she lived "nowhere near" the location of the crime.  The trial judge deemed juror no. 15 "indifferent," and both the prosecutor and defense counsel declined to challenge the juror for cause or exercise a peremptory challenge.
            Later that day, the prosecutor discovered that juror no. 15 had an undisclosed probation record for operating an uninsured motor vehicle, a charge that was dismissed after she paid a fine.  When questioned by the trial judge as to why the juror had not disclosed this record, the juror explained that she considered it irrelevant "because it was dismissed."  The juror added that she had not been arrested for the incident and reassured the court her experience would not affect her impartiality.  The judge interpreted her response as a misunderstanding of the legal significance of the charge and remained convinced that juror no. 15 would be fair and impartial.  Accordingly, the judge took no further action.  No objection was raised by the prosecutor or defense counsel.[7]
            In May 2010, the jury convicted the defendants, as well as Goode, of murder in the second degree and each was sentenced to life in prison with the possibility of parole after fifteen years.
            3.  The Fidler motions.[8]  About two years later, in 2012, while Ortiz was serving his sentence in a Department of Correction facility, a fellow inmate confronted him.  This inmate turned out to be "Karl," juror no. 15's half-brother.  During a hostile exchange, Karl called Ortiz a derogatory name and remarked "that's why my sister convicted you."  This interaction became the basis for the defendants' two attempts to investigate juror no. 15's alleged bias against them.
            i.  The first attempt.  In December 2012, the defendants, as well as Goode, jointly filed a motion pursuant to Fidler, 377 Mass. at 200-201, seeking to question juror no. 15 about potential bias.  The defendants argued that juror no. 15 had failed to disclose the prior legal troubles of her half-siblings Karl and "Shantel,"[9] as required by the juror questionnaire.  The defendants also alleged that Karl was affiliated with a gang connected to the victim's gang,[10] which they claimed influenced juror no. 15's impartiality.[11]
            Following an evidentiary hearing, the motion judge -- who also presided over the defendants' trial -- denied the Fidler motion in a written decision.  The judge determined that there was no evidence indicating juror no. 15 considered Karl or Shantel part of her "household or family" or that she was aware of their legal issues.  Thus, the judge concluded that the defendants failed to demonstrate "extraneous influence or bias" sufficient to justify a "post-verdict inquiry."  See Commonwealth v. Watt, 484 Mass. 742, 758-759 (2020), S.C., 493 Mass. 322 (2024).
            The defendants' appeals from the denial of the motion were consolidated with the direct appeals from their convictions.[12]  The Appeals Court affirmed the defendants' convictions and the order denying their Fidler motion in a published decision.  See Mitchell I, 89 Mass. App. Ct. at 30-31.
            ii.  The second attempt.  In 2017 and 2018, the defendants filed renewed motions pursuant to Fidler and motions for a new trial, citing newly discovered evidence of bias.  This evidence included social media posts involving juror no. 15 and her family.  Ortiz also filed affidavits describing his interactions with Karl in prison and Karl's alleged gang affiliation.[13]  Another affidavit, from "Paul B.," the father of juror no. 15's child, provided additional context regarding certain gang affiliations.
            The trial judge granted an evidentiary hearing to question juror no. 15, during which the defendants and their respective counsel were present and allowed to participate.[14]  Defense counsel did not raise any objections after the juror testified.  Following the hearing, the trial judge issued a memorandum of decision on August 10, 2018.
            The trial judge made the following findings.  Juror no. 15 and her half siblings, Karl and Shantel, have the same father, who "encouraged them to form relationships" despite not sharing a household.  Juror no. 15 shared a closer relationship with Shantel than Karl, whose relationship with the juror was intermittent.  Further, Paul B. became friends with Karl through the juror.  At the time of jury selection in 2010, although juror no. 15 and Paul B. had some interaction related to their child, they had no romantic relationship, and juror no. 15 was unaware of Paul B.'s alleged gang affiliation.[15]
            With respect to Shantel's prior law-related experiences, Shantel had testified under a grant of immunity in a homicide trial in 2009, but juror no. 15 was unaware of this testimony or the trial itself during jury empanelment.  Regarding Karl's prior law-related experiences, Karl was arrested in 2007 in connection with a shooting.  A September 2007 Boston Herald newspaper article detailed Karl's arrest and his involvement in a gang linked to several shootings.[16]  Juror no. 15 read the article around the time it was published, roughly two and one-half years before jury empanelment in the defendants' trial began in April 2010.  After discussing the article with Karl's mother, juror no. 15 learned about Karl's incarceration; they did not discuss his alleged gang ties.
            Juror no. 15 had no contact with Karl during the period of his incarceration from 2009 until 2011 or 2012, a period that subsumed the defendants' entire trial.  Considering juror no. 15 did not learn of Karl's alleged gang relation from any source other than the 2007 newspaper article, the trial judge found that, at the time of empanelment in 2010, the juror had no biases towards, opinions about, or loyalties to any gang or, for that matter, "anyone associated with Wilcock Street."
            After Karl was released from prison some time in 2011 or 2012, his "on and off" relationship with juror no. 15 resumed.  Upon the birth of Karl's child, their interactions increased, and juror no. 15 posted photographs on social media of her and Karl at various gatherings.  The trial judge further found that "[a]t some point after Karl's release, the juror heard through 'word on the street' that Karl had been involved in gang activity; she received no more detailed information than that."
            With respect to juror no. 15's inaccurate response of "no" to whether any "household or family" members had experiences with the law, the trial judge found:
"[T]he juror's inaccurate answer was not dishonest.  As to Shantel, the answer reflected the extent of the juror's knowledge.  As to Karl, the answer was inaccurate, and the juror knew it was inaccurate, in that the juror knew Karl had been convicted of crimes and was incarcerated.  The inaccuracy was not dishonest, however, in that it did not arise from any motive to mislead or conceal, but was based on the juror's independent evaluation of relevance."
            The judge determined that juror no. 15's testimony credibly demonstrated a lack of bias or gang-related loyalties.  Consequently, the defendants failed to prove actual or implied bias, and their motions for a new trial were denied.
            4.  Motion for disqualification.  After the judge ruled on the defendants' motions for a new trial, Goode filed a separate motion for a new trial alleging prosecutorial misconduct by the lead trial prosecutor.  The trial judge submitted notice to counsel, disclosing her professional relationship with the former prosecutor and inviting submissions on whether she should recuse herself from ruling on Goode's motion.  According to the trial judge, the professional relationship began some years after the defendants' trial, when the trial judge became chief justice of the Superior Court and the lead trial prosecutor became a Superior Court judge.  Subsequently, the trial judge delegated authority over Goode's motion to another judge and recused herself.  The trial judge cited her "substantial interaction" with the former prosecutor following his appointment as a Superior Court judge and her responsibility as chief justice of the Superior Court for overseeing the training and mentoring of new judges.  She also disclosed that she had submitted a letter of recommendation for the former prosecutor's judicial nomination, referencing his work on the defendants' cases, among other matters, as a basis for her endorsement.
            In response, the defendants jointly filed a motion seeking disqualification of the trial judge and a new Fidler hearing before a different judge, arguing that the trial judge's prior relationship with the former prosecutor raised questions about the trial judge's impartiality.  The trial judge denied the motion, reasoning that the issue raised by the defendants was unrelated to the prosecutorial misconduct alleged by Goode and had been "fully resolved" before any such allegation was made.
            The defendants' appeals from the orders denying their motions for a new trial and the order denying their motion for disqualification were consolidated.  The Appeals Court affirmed these orders, see Mitchell II, 102 Mass. App. Ct. at 848-849, and we allowed the defendants' applications for further appellate review.
            Discussion.  1.  Juror bias.  Article 12 of the Massachusetts Declaration of Rights and the Sixth Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment's due process clause, guarantee a criminal defendant the right to trial by an impartial jury.  Commonwealth v. Andrade, 468 Mass. 543, 547 (2014).  A jury is impartial when it is "capable and willing to decide the case solely on the evidence before it."  Commonwealth v. Seabrooks, 433 Mass. 439, 446 (2001), quoting Smith v. Phillips, 455 U.S. 209, 217 (1982).  Even a single biased juror violates this right and undermines the integrity of the defendant's trial.  Commonwealth v. McCowen, 458 Mass. 461, 494 (2010).  Thus, if a defendant establishes juror bias, then it constitutes structural error, and the defendant need not prove that the juror's bias affected the ultimate outcome at trial to be entitled to relief.  See Commonwealth v. Hampton, 457 Mass. 152, 163 (2010).
            Where, as here, a defendant claims that his right to an impartial jury was violated due to a dishonest answer provided during juror voir dire, we apply the framework set forth in Commonwealth v. Amirault, 399 Mass. 617, 624-625 (1987).[17]  Under the Amirault standard, we first examine whether a juror "dishonestly answered a material question on voir dire."  Id. at 625.  An answer is dishonest if the juror knowingly gave an inaccurate answer -- that is, if the juror was aware that her answer was false when she gave it.  See id.; Commonwealth v. Harrison, 368 Mass. 366, 375-376 (1975) (juror falsehood during voir dire must be "not only unmistakable but material and knowing").  Cf. United States v. Perkins, 748 F.2d 1519, 1531 (11th Cir. 1984) (test "requires a determination of whether [the juror's] answers were honest, that is, whether he was aware of the fact that his answers were false").
            If the juror's answer to a material question was dishonest, the defendant must then demonstrate, by a preponderance of the evidence, that the juror was not impartial -- i.e., that the juror was biased.  See Amirault, 399 Mass. at 626.[18]  A defendant may do so by demonstrating that the juror did, in fact, harbor actual bias against him, or by demonstrating that the surrounding factual circumstances are otherwise so extreme that the juror's bias can be presumed as a matter of law.[19]  See id. at 627-628.  Bias will be presumed only in "exceptional circumstances," based on the unique facts of a case, although we have suggested a number of scenarios that may rise to such a level.  Id. at 628 & n.5 (examples may include instances where, in severed trials, person deliberated on jury at defendant's trial after having observed trial of codefendant, or where juror was victim of similar crime and consciously concealed fact during voir dire).
            Regardless of how a defendant meets this latter burden, establishing juror bias is crucial to prevailing on such a claim.  While a defendant's constitutional right to an impartial jury is inviolable, that does not mean defendants are "entitled to perfection in the trial process."  Amirault, 399 Mass. at 624.  Where postverdict evidence indicates that a juror gave a dishonest answer, but there is no indication of bias, it does not serve "the important end of finality to wipe the slate clean simply . . . because counsel lacked an item of information" that should have been disclosed during voir dire.  McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 555 (1984) (McDonough).[20]
            On appeal from the denial of a motion for a new trial premised on a claim of juror dishonesty, our general standard of review is for an abuse of discretion.  Commonwealth v. Bonnett, 482 Mass. 838, 843-844 (2019).  However, because the Amirault test implicates a juror's subjective motives and biases, a judge's ruling normally involves an evaluation of the juror's credibility -- a question of fact that is heavily dependent on assessing the juror's demeanor.  McCowen, 458 Mass. at 493.  The motion judge's determination in that regard, based on a posttrial examination of the juror in question, is thus entitled to substantial deference, particularly where the judge also presided over the trial.  See id.  See also Commonwealth v. Corey, 493 Mass. 674, 684 (2024).  Accordingly, this court will not disturb a trial judge's findings that a juror is unbiased in such circumstances "absent a showing that the judge's conclusion was clearly erroneous."  McCowen, supra at 493-494.  See Amirault, 399 Mass. at 626.  With this framework in mind, we now turn to the facts of the instant case.
            As to the first prong of the Amirault standard, concerning the dishonesty of the juror's answer, the trial judge's finding that juror no. 15 did not respond dishonestly was clearly erroneous.  As the trial judge acknowledged, the juror's answer concerning her family's experiences with the law was inaccurate, given her half-siblings' interactions with the legal system.  While an inaccurate answer is not necessarily dishonest, as in cases of misunderstanding or memory lapse, here the trial judge expressly found that the juror "knew [her answer] was inaccurate" because she was aware of her half-brother's convictions and incarceration.[21]  Contrast Amirault, 399 Mass. at 626-627 (misstatement due to memory lapse); Sampson v. United States, 724 F.3d 150, 164 n.8 (1st Cir. 2013) (inaccurate, but honest, answers include those where juror "misunderstands the wording of the question, fails to recall the correct response, or is not asked a question that would necessitate disclosure of the relevant information").  Thus, because the juror knowingly provided an inaccurate answer during voir dire, that answer was, by definition, dishonest.  See Amirault, supra at 626 ("crucial inquiry is . . . whether the juror was aware that the answer was false").
            That does not end the inquiry, however.  As stated, a defendant must also demonstrate that "it is more probable than not that the juror was biased against the [defendant]" (citation omitted).  Amirault, 399 Mass. at 630.  In making this assessment, judges must remain cognizant that "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial."  Id. at 625, quoting McDonough, 464 U.S. at 556.  Here, the trial judge found that the juror's answer "did not arise from any motive to mislead or conceal, but was based on the juror's independent evaluation of relevance."  While that "independent evaluation" was contrary to the explicit instructions given by the trial judge to disclose "all responsive information," the judge concluded that the juror's nondisclosure was not unreasonable, given her limited information concerning Karl and any gang activity underlying the incident at issue in the case.  In light of these findings, the trial judge ultimately determined that the defendants did not show that juror no. 15 had harbored bias against them and did not establish a violation of their right to a fair trial.
            On appeal, the defendants characterize the juror's claimed lack of gang-related knowledge during voir dire as inaccurate.  However, the trial judge explicitly credited the juror's testimony in this regard, and inferred that "the juror's life experience," unrelated to the case, led her to be cautious about avoiding exposure to or knowledge of gang activity, which she had done.  While there are "exceptional" circumstances in which a judge's credibility findings may be successfully challenged on appeal because they were "plainly wrong," the defendants have not demonstrated that this is such a case.  Commonwealth v. Bruno-O'Leary, 94 Mass. App. Ct. 44, 49 (2018), quoting Springgate v. School Comm. of Mattapoisett, 11 Mass. App. Ct. 304, 310 (1981).  
            At the time of empanelment, juror no. 15 and Karl had not spoken for approximately two and one-half years.  Moreover, Karl had never been a member of her household, and their biological connection did not equate to a close personal relationship.  The juror also had no personal knowledge regarding her estranged half-brother's criminal charges, gang affiliation, or incarceration.  Instead, she had read a newspaper article, years prior to the defendants' trial, providing those details.  More importantly, information whether the article was accurate, and whether the juror believed it was accurate, is nowhere in the record.
            In any event, the trial judge's findings as to juror no. 15's motives for providing an inaccurate answer -- a central focus of the bias analysis -- were not clearly erroneous.  To begin, juror no. 15 completed her questionnaire before learning any details about the case, eliminating the possibility that her dishonesty was motivated by a desire to join the venire because of the subject matter of the case.  And while juror no. 15 subsequently learned about the case during empanelment, that description did not reference gangs or gang-related activity.  Thus, even if the juror had been aware of Karl's gang involvement from the article she had read years earlier, she would not have understood any possible relevance to the case at hand.  These circumstances are consistent with the explanation that juror no. 15 ultimately provided as to why she did not disclose her half-brother's criminal history -- she subjectively believed that it was not relevant and did not need to be disclosed -- an explanation that the trial judge credited as "a true reflection of the juror's thinking when she filled out her jury questionnaire."
            Given these findings as to the juror's underlying motivation, we similarly conclude that there was no error in the trial judge's determination that the defendants failed to demonstrate actual bias.  The judge determined that the juror's subjective assumption that the information was irrelevant, and the juror's erroneous belief that it need not be disclosed, did not reflect bias against the defendants.  In light of the judge's finding that these motivations were unrelated to the defendants or the case at hand, and did not otherwise implicate the juror's ability to decide the case fairly, this determination was not clearly erroneous.  See McDonough, 464 U.S. at 556 ("only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial").[22]
            Nor did the defendants demonstrate that the circumstances surrounding the juror's dishonest answer were so egregious that bias must be presumed as a matter of law.  While Karl's hostile remark to Ortiz -- "that's why my sister convicted you" -- is certainly troubling on its face, it was made almost two years after the trial by the juror's half-brother, rather than the juror herself.  The stray remark does not support a presumption of bias, particularly given that the juror herself was effectively estranged from her half-brother during his incarceration and did not visit or communicate with him at that time.  Without more, we cannot say that this rises to the level of "exceptional circumstances" from which bias must be presumed.  Amirault, 399 Mass. at 628 & n.5.
            Our conclusion today rests in large part on the great deference an appellate court owes to a trial judge's determination of juror impartiality.  See McCowen, 458 Mass. at 493.  Unlike the cold record before us on appeal, the trial judge had the opportunity to observe and question juror no. 15 directly during the evidentiary hearing, and to compare that behavior to the judge's recollection of the juror's conduct during voir dire, when the juror, using her own mistaken relevance standard, acknowledged her failure to disclose a dismissed motor vehicle offense.  The trial judge also had the advantage of listening to juror no. 15's concerns about another juror during the trial.  Each of these in-person interactions afforded the trial judge a unique vantage point from which to evaluate whether the juror's omission regarding Karl stemmed from an intent to conceal her own bias.  Unlike the trial judge, we do not have the advantage of these direct observations of juror no. 15, and the record before us provides no basis to question the judge's credibility determinations as to the juror's motivations and impartiality.  Accordingly, the trial judge did not abuse her discretion in denying the defendants' motions for a new trial.
            2.  Disqualification of the trial judge.  Article 29 of the Massachusetts Declaration of Rights mandates that judges remain "as free, impartial and independent as the lot of humanity will admit."  This foundational principle safeguards "the integrity of the judiciary and the judicial process" by demanding not only actual impartiality but also the avoidance of "even the appearance of partiality" (citation omitted).  Commonwealth v. Cousin, 484 Mass. 1042, 1046 (2020).  When reviewing a motion for judicial disqualification, the question is whether the judge's refusal to recuse constitutes an abuse of discretion.  Commonwealth v. Rivera, 473 Mass. 1003, 1005 (2015).
            A judge's decision to recuse entails both subjective and objective evaluations.  See Lena v. Commonwealth, 369 Mass. 571, 575 (1976).  See also S.J.C. Rule 3:09, Canon 2, Rule 2.11 (A) (2016) ("A judge shall disqualify himself or herself in any proceeding in which the judge cannot be impartial or the judge's impartiality might reasonably be questioned . . ." [emphasis added]).  The subjective evaluation requires judges to assess whether they believe they can remain impartial under the circumstances.  Cousin, 484 Mass. at 1045.  The objective evaluation considers whether "a disinterested observer, informed of all the circumstances, [would] reasonably believe that the judge's impartiality may have been compromised."  Id. at 1045-1046.
            In denying the defendants' motion for disqualification, the trial judge emphasized that the circumstances prompting her prior recusal in Goode's case were inapplicable here.  Unlike Goode's motion for a new trial, which alleged prosecutorial misconduct, the present motion focused solely on the judge's impartiality.  The judge concluded that she could remain impartial, a determination the defendants do not contest.  Accordingly, we accept the judge's subjective assertion of her impartiality.
            Instead, the defendants challenge the trial judge's objective impartiality.  They argue that her professional relationship with the trial prosecutor -- whom she supported in his bid for a judicial appointment and later supervised -- creates an objective appearance of partiality.  In support of this argument, the defendants cite Cousin, 484 Mass. at 1046, where we held that a single justice of this court did not err or abuse her discretion in ordering the recusal of a Superior Court judge, who was asked to rule on a postjudgment motion involving a former prosecutor who had become her judicial colleague.  The defendants contend that their case presents even stronger grounds for recusal, as the judge not only endorsed the prosecutor's judicial appointment, but also referenced his work on the defendants' cases.
            We find no abuse of discretion in the trial judge's decision.  Judicial bias generally must stem from an "extrajudicial source, and not from something learned from participation in the case."  Commonwealth v. Adkinson, 442 Mass. 410, 415 (2004).  While the judge subsequently worked with the former prosecutor, this fact alone does not suffice to call her impartiality into question absent additional evidence or allegations of prosecutorial misconduct.  See Commonwealth v. Montalvo, 604 Pa. 386, 416 (2009), cert. denied, 562 U.S. 857 (2010) (where prosecutor had become judge following defendant's trial, recusal of different judge of same county was not required).  Moreover, the judge's endorsement of the prosecutor's judicial candidacy –- referencing his work on the defendants' case -- does not alone create an appearance of partiality.  A more substantial connection is required.  See, e.g., Tundidor v. State, 361 So. 3d 775, 778 (Fla. 2023) (disqualification required where judge, while in robe, embraced the prosecutor and later "commiserated" with him during postconviction proceedings).
            Furthermore, Cousin is distinguishable on two key grounds.  First, in Cousin, the postjudgment motion was predicated on allegations that the prosecutor, who had since become a judge, had withheld discovery, requiring the motion judge to assess the credibility of a judicial colleague.  Cousin, 484 Mass. at 1043-1044.  Similar considerations distinguished Goode's motion from the defendants' motion, as the judge noted.  Second, the judge in Cousin made strong, repeated statements acknowledging her potential bias due to the prosecutor's judicial appointment, thereby creating an unavoidable appearance of partiality.  Id. at 1046.  Here, by contrast, the trial judge made no such admissions.
            Finally, there is no indication that the trial judge's rulings were influenced by anything other than the law.  See Commonwealth v. Daye, 435 Mass. 463, 470 n.4 (2001) (judge properly weighed factors and made rulings uninfluenced by extraneous considerations "other than the law").  A disinterested observer, fully informed of the circumstances, would not reasonably conclude that the judge's impartiality was compromised.
            Conclusion.  Regarding the defendants' motions for a new trial, we cannot say that the trial judge abused her discretion in concluding that the defendants failed to demonstrate juror bias, in light of the judge's subsidiary findings and credibility determinations concerning juror no. 15.  Furthermore, we find no abuse of discretion in the trial judge's decision to deny recusal.  Accordingly, we affirm the orders denying the motions for a new trial and the order denying the motion for disqualification.
            So ordered.
 
footnotes

 
            [1] One against Pedro Ortiz and one against Terrance Pabon.
            [2] Goode is not a party to this appeal.  See Commonwealth v. Mitchell, 102 Mass. App. Ct. 831, 832 (2023).  "Goode's direct appeal originally was consolidated with the [defendants']; however, by motion and pursuant to an order of [the Appeals Court], Goode's appeal was severed."  Commonwealth v. Mitchell, 89 Mass. App. Ct. 13, 14, cert. denied, 580 U.S. 899 (2016).
            [3] We acknowledge the amicus letter submitted by Brian G. Brito.
            [4] A more comprehensive description of the trial judge's findings can be found in Mitchell II, 102 Mass. App. Ct. at 836-840.  Additional trial facts are available in Mitchell I, 89 Mass. App. Ct. at 15-17.
            [5] The outlined legal interactions in the questionnaire included being arrested, sued, served with a court order, charged or convicted of a crime; acting as a witness in civil or criminal proceedings; serving on a jury; being a crime victim; filing a lawsuit; or seeking a court order.  The terms "household" and "family" were not defined.
            [6] The trial judge previously explained to the venire:
"Being fair and impartial doesn't necessarily require that you've never had any experiences, or read anything or heard anything, or had any thoughts or opinion on any subject that might be relevant. . . .  Being fair and impartial requires that you can, and you will, put aside any experiences or anything you may have read, or heard, or thought about [the] relevant subject matter and that you will decide the facts of this case based solely on the evidence that will be presented in the trial of this case."
            [7] On appeal, the defendants do not directly challenge juror no. 15's failure to disclose her own prior experience with the law.
            [8] In Fidler, 377 Mass. at 201-204, this court established the procedure by which a judge may conduct a postverdict inquiry into a juror's exposure to extraneous matters.  We later adopted this procedure for postverdict inquiries into juror statements reflecting possible bias.  Commonwealth v. McCowen, 458 Mass. 461, 497 (2010).  Additionally, where (as here) it is discovered after the verdict that a juror allegedly answered a voir dire question falsely, a hearing is required if "a defendant raises a reasonable claim of juror misconduct."  Commonwealth v. Amirault, 399 Mass. 617, 625 (1987).
            [9] The defendants' investigator revealed this alleged familial connection between the juror and Shantel, along with information that Shantel had been a witness in a 2009 murder trial.
            [10] Although no evidence of gang affiliation was admitted at trial, defense counsel alleged that the victim was associated with a gang known as "MOB."
            [11] Additionally, the defendants asserted that juror no. 15 waved to a court room spectator -- identified as the victim's aunt and a former high school acquaintance of the juror -- and that the juror's response to a voir dire question about her familiarity with the location of the crime was "'oblique' and evasive."  However, the judge determined that the defendants did not present a credible claim of bias.  Addressing these concerns, the judge noted that, even if the juror had waved to the victim's aunt, there was no evidence that the juror was aware of the spectator's relationship to the victim or that their prior acquaintance could result in bias.  Additionally, the judge concluded that juror no. 15's residence, located about one mile from the location of the crime, did not axiomatically suggest any bias.
            [12] The Appeals Court severed Goode's appeal from the defendants' appeal.  See note 2, supra.
            [13] Ortiz averred that a rivalry existed between certain gangs and Wilcock Street residents.  However, the trial judge observed that, in his affidavits, Ortiz neither acknowledged his own gang affiliation nor provided any other basis for his alleged knowledge of the relationships among various gangs.  Additionally, the judge noted Ortiz's effort to distance himself from gang involvement during the evidentiary hearing on the defendants' original Fidler motion.  Thus, the judge discredited Ortiz's claim of a violent rivalry.  As stated in Commonwealth v. Corey, 493 Mass. 674, 684 (2024), "[t]he judge has the discretion to weigh the credibility and import of affidavits submitted in support of a motion for a new trial."
            [14] We note that "post-verdict interviews of jurors by counsel, litigants, or their agents [should] take place under the supervision and direction of the judge."  Fidler, 377 Mass. at 202.  Here, the trial judge properly held a nonevidentiary hearing with the cooperation of the district attorney's office and defense counsel before finding it appropriate to subject the juror to intrusive postverdict questioning.  At the postverdict interview, the judge conducted the inquiry of the juror based on defense counsel's proposed areas of inquiry and questions.
            [15] Paul B. averred that he was a member of the "BMB" group, which had affiliations with "MOB."  The trial judge therefore recognized that Paul B., unlike Ortiz, provided a basis of knowledge about the relevant gangs in his affidavit.  However, the judge concluded that Paul B.'s affidavit offered nothing to support a challenge for cause based on information that Karl was affiliated with a gang two and one-half years before the defendants' trial.
            [16] The article also referenced Karl's arrest in July of that year "for a daylight brawl on the steps of Dorchester District Court."
            [17] In formulating the Amirault standard for analyzing juror dishonesty, this court discussed the test articulated by a plurality of the United States Supreme Court in McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548 (1984) (McDonough).  Amirault, 399 Mass. at 624-626.  There, the opinion of the Court stated that "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause," McDonough, supra at 556, but a majority of the justices joined concurrences that expressed disagreement as to the proper scope and application of this test, see id. at 556-557 (Blackmun, J., concurring, with whom Stevens and O'Connor, JJ., joined) (acknowledging that "in most cases" juror dishonesty is best indicator as to juror impartiality, but construing test as merely one specific application of broader standard for juror bias claims); id. at 557-558 (Brennan, J., concurring, with whom Marshall, J., joined) (expressing "difficulty [in] understanding the import" of legal standard adopted by Court, and suggesting that juror dishonesty, and motive for same, should merely be considered as factors in assessing juror bias).  See also Sampson v. United States, 724 F.3d 150, 160 (1st Cir. 2013) (noting that Federal framework for juror dishonesty claims "is not well-defined").
            To be clear, our lodestar for analyzing postverdict claims of juror dishonesty is the standard set forth by this court in Amirault and discussed herein.  To the extent that the formulation endorsed by the plurality in McDonough diverges from the Amirault standard, it does not control, notwithstanding any passing references to McDonough in prior decisions.  See, e.g., Commonwealth v. Emerson, 430 Mass. 378, 384 (1999), cert. denied, 529 U.S. 1030 (2000).
            [18] One passage of Amirault, 399 Mass. at 625, refers to this as the defendant's burden to show "that prejudice resulted from the dishonesty."  The term "prejudice" is often used in the context of a defendant's burden to demonstrate harm from an established error of law (e.g., "prejudicial error").  Where, as here, the underlying claim is one of structural error, use of the term "prejudice" could be confusing, and we avoid relying on it herein.
            [19] We have sometimes referred to this as "implied bias."  See Amirault, 399 Mass. at 630.  See generally United States v. Wood, 299 U.S. 123, 133–134 (1936) ("The bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as matter of law").
            [20] In this manner, postverdict claims of juror dishonesty stand on much different footing from decisions made midtrial as to the appropriate remedy for revelations of juror misconduct.  See Commonwealth v. Cousin, 449 Mass. 809, 821 n.20 (2007), cert. denied, 553 U.S. 1007 (2008).
            [21] Although the defendants do not press the argument on appeal, the trial judge's finding that juror no. 15's answer was honest with respect to her half-sister Shantel was not clearly erroneous.  The juror testified explicitly that she was unaware of Shantel's involvement in any case at the time of the voir dire, and the trial judge credited this testimony.  Accordingly, we confine our analysis to the juror's response concerning her half-brother.
            [22] Indeed, while not explicitly cited in the trial judge's decision, juror no. 15's conduct during the trial suggested that she was attuned to the importance of fairness to the deliberation process.  As the judge noted in her ruling on the first Fidler motion, two days after being seated on the jury, juror no. 15 and another juror alerted the judge that a third juror appeared to demonstrate cognitive impairment.  In reporting this concern, juror no. 15 stated, "I think it would be unfair to the defendants for [the cognitively impaired juror] to make a decision on their life."